# EXHIBIT B

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------------x

JANE DOE ONE and TWO,                          :

                             Plaintiffs,          :

           -against-                                :

VENIAMIN GONIKMAN, ALEKSANDR                   :
MAKSIMENKO, JOHN SANDS, ROSE TALENT            :
AGENCY, INC., and BFC MANAGEMENT COMPANY       :
d/b/a ACE OF SPADES GENTLEMAN'S CLUB f/d/b/a   :
CHEETAH'S ON THE STRIP                         :
                             Defendants.          :

-------------------------------------------------------------------x

Index Number 2:13-cv-14057-MOB-PJK

Hon. Marianne O. Battani

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs Jane Doe One and Jane Doe Two, by and through their attorneys, for their First Amended Complaint against Defendants Veniamin Gonikman ("Gonikman"), Aleksandr Maksimenko ("Maksimenko"), John Sands ("Sands"), Rose Talent Agency, Inc. ("Rose Talent") and BFC Management Company d/b/a Ace of Spades Detroit f/d/b/a Cheetah's On The Strip ("BFC" or "Cheetah's On The Strip")[1], allege as follows:

### PRELIMINARY STATEMENT

1.      Plaintiffs are two young Ukrainian women, who were victims of sex and labor trafficking, involuntary servitude and forced labor as defined by the Victims of Trafficking and Violence Protection Act of 2000 (hereinafter "TVPA"), 18 U.S.C. §§ 1581 *et seq*., and the

---

[1] Defendant BFC filed a voluntary petition for Chapter 11 bankruptcy protection on October 10, 2014, staying Plaintiffs' prosecution of claims against the company.  Accordingly, Plaintiffs are amending the Complaint only as to the non-stayed Defendants.  For the avoidance of doubt, Plaintiffs are not prosecuting their claims against BFC while the automatic stay is in place.

Americas 90418210

Trafficking Victims Protection Reauthorization Act of 2003 (hereinafter "TVPRA"), 22 U.S.C. § 7101.

2.      Plaintiffs bring this action using pseudonyms pursuant to the Protective Order issued by this Court on February 28, 2014.

3.      Through their company, Defendants Beauty Search, Inc.,[2] Gonikman, Maksimenko, Mikhail Aronov ("Aronov"[3], and collectively, the "Beauty Search Partners") and Defendant Sands as principal and agent for Defendant Rose Talent recruited, enticed and transported Plaintiffs from the Ukraine to the United States.  Upon Plaintiffs' arrival in the United States, the Beauty Search Partners harbored and virtually enslaved Plaintiffs for commercial advantage and private financial gain.  The Beauty Search Partners forced Plaintiffs to work as strippers 12 hours a day, six days a week, for more than 72 hours a week for months and months through intimidation, confiscation of the women's passports and other identification and immigration documents, isolation from society, restrictions on movement, mental, physical and sexual abuse, threats of physical and sexual abuse and other tools of coercion.

4.      Defendant Sands, by and through his talent agency, Rose Talent, acted as a talent recruiter for the Beauty Search Partners and was an integral part of the Beauty Search Partners' sex trafficking and forced labor scheme involving Plaintiffs.  In addition, Defendant Sands, through his role as owner and talent agent with Rose Talent, acted as a talent agent for the dancers trafficked to the United States by the Beauty Search Partners, obtaining dancing licenses

---

[2] Although VMA, Inc. d/b/a Beauty Search, Inc. (hereinafter "Beauty Search") was the vehicle through which Defendants Gonikman, Maksimenko and Aronov recruited and trafficked Plaintiffs, Beauty Search is not named as a defendant in this action because public records indicate that the business entity, VMA, Inc. was dissolved on July 15, 2005.

[3] Plaintiffs named Aronov in the original complaint filed September 23, 2013.  Plaintiffs voluntarily dismissed without prejudice Defendant Aronov from this action on April 25, 2014.

3

for the women and placing them at strip clubs in exchange for which Sands received a weekly

fee. Rose Talent and Sands provided knowing and substantial assistance to the Beauty Search

Partners in their violations of the TVPA and the TVPRA's proscriptions on sex trafficking,

forced labor and involuntary servitude for its commercial advantage and financial gain. Sands

and Rose Talent aided and abetted the Beauty Search Partners' violations of the TVPA and the

TVPRA's proscriptions on sex trafficking, forced labor and involuntary servitude by providing

knowing and substantial assistance to the Beauty Search Partners in their sex trafficking and

forced labor scheme.

5.      Defendant BFC knowingly obtained Plaintiffs' labor and services as strippers at

the club, Cheetah's On The Strip, for its commercial advantage and financial gain. In addition,

BFC aided and abetted the Beauty Search Partners' violations of the TVPA and the TVPRA's

proscriptions on sex trafficking, forced labor and involuntary servitude by providing knowing

and substantial assistance to the Beauty Search Partners in their sex trafficking and forced labor

scheme.

6.      Each of the Defendants benefitted financially or received something of value from

the exploitation, forced sexual services and forced labor of Plaintiffs.

7.      Accordingly, Plaintiffs seek damages under 18 U.S.C. § 1595(a) from all

Defendants.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 18 U.S.C. § 1595(a), a federal question, this case arising under the Trafficking Victims

Protection Act.

4

9.     This Court has personal jurisdiction over Defendant Gonikman because his conduct giving rise to Plaintiffs' claims took place, in substantial part, in and around Detroit, Michigan.

10.    This Court has personal jurisdiction over Defendant Maksimenko because his conduct giving rise to Plaintiffs' claims took place, in substantial part, in and around Detroit, Michigan.

11.    This Court has personal jurisdiction over Defendant Sands because he resides in and around Detroit, Michigan. Further, his conduct giving rise to Plaintiffs' claims took place, in substantial part, in and around Detroit, Michigan.

12.    This Court has personal jurisdiction over Defendant Rose Talent because Rose Talent is a Michigan corporation with its principal place of business in and around Detroit, Michigan and its conduct, through its management and personnel, giving rise to Plaintiffs' claims took place in and around Detroit, Michigan.

13.    This Court has personal jurisdiction over Defendant BFC because BFC is a Michigan corporation with its principal place of business in Detroit, Michigan and its conduct, through its management and personnel, giving rise to Plaintiffs' claims took place in and around Detroit, Michigan.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## <u>PARTIES</u>

15.    Jane Doe One is a citizen of Ukraine currently residing in the United States.

16.    Jane Doe Two is a citizen of Ukraine currently residing in the United States.

5

17.     Gonikman is a naturalized citizen of the United States originally from the Ukraine.

18.     Maksimenko is a citizen of the United States.  He is Defendant Gonikman's son.

19.     Sands is a citizen of the United States.  He is the owner of Rose Talent, an agency which places, for a fee, exotic dancers at clubs and other entertainment establishments throughout the Detroit area, including during the relevant period at issue here, at Cheetah's On The Strip.

20.     Rose Talent is a Michigan corporation with its principal place of business at 18605 East 11 Mile Road, Detroit, Michigan 48066.

21.     BFC is a Michigan corporation with its principal place of business at 19245 East 8 Mile Road, Detroit, Michigan 48219.  At the time of the events described above, BFC was doing business under the name Cheetah's On The Strip.  Upon information and belief, after a fire destroyed the building housing the Cheetah's On The Strip club in 2005, BFC changed the name under which it does business to "Ace Of Spades Gentleman's Club" and BFC is currently doing business under that name in a new building at the same address.

## FACTUAL ALLEGATIONS

I.     Recruitment and Trafficking to the United States

22.     In 2001, the Beauty Search Partners conceived and executed a plan to recruit and entice Plaintiffs to move to the United States with promises of a better life.  Using a Detroit-based exotic talent agent as the "American face" of their scheme lent an air of credibility to these empty promises.  In reality, upon Plaintiffs' arrival in the United States, the Beauty Search Partners intended to virtually enslave the women and force them to strip and perform lap dances at a strip club (Cheetah's On The Strip) 12 hours a day, six days a week, for more than 72 hours

6

a week, month after month.  It was the Beauty Search Partners' intention to confiscate all of the women's earnings for their own personal financial gain.  Sands, the so-called talent agent or talent recruiter, benefitted financially in the form of weekly payments from Cheetah's On The Strip for each woman forced to dance at that club and from a multiple-year business relationship with the Beauty Search Partners through which Sands and Rose Talent placed at least a dozen women at clubs around Detroit.

23.     The Beauty Search Partners' scheme or plan to exploit Plaintiffs' labor and services was centered around their ability to maintain what they referred to as 'leverage' over Plaintiffs, as foreign women in the United States, who: (a) spoke little to no English; (b) had no identity and immigration documents because they were confiscated by the Beauty Search Partners upon their arrival in the United States; (c) had no money of their own and means to earn their own money because the Beauty Search Partners confiscated every penny they earned; and (d) were isolated in the suburbs with no access to transportation or telephones.

24.     The Beauty Search Partners, with the substantial assistance of Sands and Rose Talent, executed this plan.

II.     Defendant Sands' and Rose Talent's Involvement in the Trafficking Scheme

25.     Defendant Sands is the founder and owner of Rose Talent, an established talent recruitment business based in Detroit that he has owned and operated as the principal agent for twenty years.  Through Rose Talent, Sands places exotic dancers in clubs in the Detroit metropolitan area.

26.     An agent for exotic entertainment, like Defendant Sands, finds a club for a prospective dancer to dance in, introduces the dancer to the club's management, explains to the dancer how the club operates and when and where to dance, assists the dancer in obtaining the

Americas 90418210

required dancing license and visits the clubs where the agent's dancers are placed to check in on them.  Because of the agent's relationship with the dancer, the agent would have to know where the dancer came from, how she was recruited and other information regarding the dancer's circumstances.  In fact, the current manager of Cheetah's On The Strip, who has worked with Sands in his capacity as a talent agent in the past, stated that Sands would have been in a position to know about the trafficking scheme.

      27.    Defendant Sands' longstanding business relationship with the Beauty Search Partners began in or around 2000-2001, when Maksimenko contacted Sands by telephone and requested that he send roughly a dozen dancers from the United States to Defendant Gonikman's club, named Dolls, located outside Athens, Greece.  As a means to induce Sands to send dancers to the club in Greece, Gonikman and Maksimenko offered to pay for Sands and his girlfriend to travel to Greece for a "vacation."  During this trip, Sands met Gonikman for the first time and spent a substantial amount of time with Gonikman.  For example, while Sands and his girlfriend were vacationing in Greece on the Beauty Search Partners' dime, Gonikman took Sands and his girlfriend sightseeing around Greece.  Additionally, Gonikman showed Sands the Dolls nightclub and the apartments where the American dancers would be living while in Greece.  In exchange for sending girls to Greece, Sands was to be paid $175 a week, which was five times the amount Sands typically received from Detroit clubs for each dancer.  Gonikman advised Sands that he would pay for the dancers' airfare to Greece as well as their room and board while the women were dancing in Greece.  Following his trip to Greece, Sands fully intended to send dancers to Gonikman's club in Greece.  However, Sands ultimately was unable to obtain visas for the dancers due to American intervention in the Kosovo conflict.

8

28.     The next time that Sands heard from the Beauty Search Partners was in 2003.  It was at this time that Defendant Sands first became involved in the Beauty Search Partners' scheme to traffic foreign women into the United States to force them to work as strippers.  At this time, Sands, through Rose Talent, served as the agent for the then-wives of Gonikman and Maksimenko by placing the women, who were Ukrainian and Greek, respectively, as dancers at the Flight Club in Detroit.

29.     Shortly thereafter, the Defendants scaled up their trafficking scheme in the United States.  Over the next two years, Defendant Sands placed at least a dozen foreign-born women brought to the United States by the Beauty Search Partners, including Plaintiffs Jane Doe One and Two, in strip clubs in the Detroit area.  Sands selected Cheetah's On The Strip as one of the strips clubs to which these foreign women would be funneled.  Sands chose Cheetah's On The Strip because it was one of the top three clubs at which he placed dancers during the relevant time period.  Sometimes Maksimenko and Aronov directed Sands as to which specific club Sands should place an individual woman whom was brought to the United States as part of the trafficking scheme.

30.     Not only did Defendant Sands provide Gonikman, Maksimenko and Aronov with a foothold in Detroit-based strip clubs to enable them to carry out their trafficking scheme, Defendant Sands also helped to create a pipeline for Ukrainian dancers to come to the United States and he provided legitimacy to the operation such that potential Ukrainian recruits would be more likely to accept the Beauty Search Partners' offer to go to the United States.  To illustrate, around 2004-2005, the Beauty Search Partners were struggling to recruit women from the Ukraine to go to the United States.  At this time, Gonikman and Maksimenko again offered to pay and, in fact, paid for Defendant Sands to visit the Ukraine to assist with recruiting women

to go to the United States.  The purpose of the visit was for Sands to persuade Ukrainian women that legitimate employment opportunities awaited them in the United States.  Having an American business associate meet with and encourage potential trafficking recruits gave the Beauty Search Partners more credibility in the eyes of the women they sought to traffic to and exploit in the United States.

31.     In or around 2004 while Defendant Sands was in the Ukraine at the request of the Beauty Search Partners, he visited a club in Kiev named "Vegas" owned by Defendant Gonikman.  When Sands arrived at the club, approximately thirty-five women were lined up across the stage.  Gonikman told Sands that the women had been hired to work at the club once it opened.  Gonikman instructed Sands to pick three of these women for sexual relations, which he did.

32.     In addition, Plaintiffs met Defendant Sands when he was in the Ukraine in or around 2004.  The Beauty Search Partner introduced Sands as a "friend" of theirs.

33.     Defendant Sands also played an instrumental role in the Beauty Search Partners' trafficking scheme by obtaining the required dancing licenses for Plaintiffs Jane Doe One and Two.  Defendant Sands used the fraudulent Florida drivers' licenses that the Beauty Search Partners created for Jane Doe One and Two in order to obtain their dancing licenses.  Using his connections, Sands was able to procure the licenses without Jane Doe One and Two needing to be interviewed by any official at the licensing department; he simply handed over the identification documents the Beauty Search Partners provided to him, along with the money for the license (also provided by the Beauty Search Partners).

34.     During the relevant time period, Defendant Sands regularly went to Cheetah's On The Strip.  He would frequent the club for two to three hours a night from approximately 7:00pm

in the evenings until 9:00 PM or 10:00 PM.  Sands typically spent around fifteen hours per week at Cheetah's On The Strip.  While at the club, Sands dined, ordered drinks and watched the dancers while conversing with the club owner and/or other employees of Cheetah's On The Strip.  While he was at the club, Sands was often with Maksimenko and Aronov.

35.     During the fifteen hours a week that he spent at Cheetah's On The Strip, Defendant Sands was aware that the Beauty Search Partners always dropped off Plaintiffs at the club; he never saw Plaintiffs Jane Doe One or Two arrive at the club without at least one of the Beauty Search Partners accompanying them.  Defendant Sands was also aware that the women brought to the United States by the Beauty Search Partners were generally working double shifts every day, six days per week.  Sands estimated that during the relevant time period, "very few" or "less than 10" of the more than 500 dancers that he represented worked two shifts per day, six days per week.

36.     Further, Sands knew that Maksimenko and the other Beauty Search Partners were benefitting financially from the scheme because Jane Doe One and Two were required to pay fees to the Beauty Search Partners.  Maksimenko told Sands that the payments were to repay the Beauty Search Partners for having created the "opportunity" for these women to immigrate to the United States, including having prepared the required paperwork.

37.     Sands had a close business and social relationship with the Beauty Search Partners.  During the relevant time period, he spoke daily with Maksimenko and went out socially with Maksimenko, including sometimes gambling with him.  Even after Maksimenko was sentenced to prison in connection with the scheme alleged herein, Maksimenko and Sands maintained their relationship.  Indeed, Maksimenko has called Sands from prison approximately 4-6 times.  Sands testified that, in addition to small talk, the two would talk about strip clubs in

Americas 90418210

the Detroit area, including about the owners of the clubs where they had placed foreign-born women trafficked from the Ukraine, and Maksimenko would try to learn what was going on back in Detroit.  Maksimenko and Aronov took the Plaintiffs to Sands' house where the three men smoked marijuana and socialized.  Additionally, throughout their business relationship Sands met with Gonikman 200-300 times and often went out to dinner with Gonikman when Gonikman visited Detroit.

38.     Because of his business relationship with the Beauty Search Partners, Sands acknowledged that the women brought over by the Beauty Search Partners, including Jane Doe One and Two, would have viewed him as part of the Beauty Search Partners.

39.     Defendant Sands benefitted financially from participating in the Beauty Search Partners' exploitation of Jane Doe One and Two.  Sands was paid at least $35 per week for each woman who he placed and who was forced to work at Cheetah's On The Strip.  Thus, excluding the other ten women the Beauty Search Partners brought over from the Ukraine whom Sands placed at clubs in Detroit, Sands earned $70 each week for the approximately sixty weeks that Jane Does One and Two were forced to work at Cheetah's On The Strip.

40.     In sum, Defendant Sands, by and through Rose Talent, substantially assisted in the Beauty Search Partners' scheme to obtain the forced labor and sexual services of Plaintiffs in at least three ways.  First, Sands substantially assisted in the recruitment of Plaintiffs to the United States to be exploited by the Beauty Search Partners.  Sands, by and through Rose Talent, lent an air of legitimacy to the Beauty Search Partners' claim that they could offer a better life to Plaintiffs by finding them legitimate, well-paying jobs in the United States.  Second, through use of his extensive knowledge of strip clubs and industry practices in the Detroit area to provide an introduction to Cheetah's On the Strip, Sands assisted the Beauty Search Partners in finding the

12

club at which they forced Plaintiffs to dance 12 hours a day, six days a week, for months and

months.  Third, Sands and Rose Talent served as Plaintiffs Jane Doe One and Two's so-called

"agent" during the time that they danced at Cheetah's On The Strip.  As Plaintiffs' agent, Sands

obtained dancing licenses for Plaintiffs using fraudulent identification for the women that he

received from the Beauty Search Partners for the purpose of legitimizing them as licensed

dancers at Cheetah's On The Strip in the event of periodic law enforcement checks of exotic

dancers' licenses.

     41.     Defendant Sands knew or was reckless in not knowing of and substantially aided

and abetted the Beauty Search Partners' scheme to exploit Jane Doe One and Two and force

them to engage in commercial sex acts and forced labor through means of force, fraud and

coercion.

III.    <u>Jane Doe One</u>

     42.     Jane Doe One was born in the Ukraine and grew up in a small Ukrainian town.

Her parents were engineers and she was a gymnast.

     43.     Jane Doe One decided to attend college in Kiev and major in management. She

originally lived in a dorm.  She then began living with her grandmother, but soon sought a job to

pay for her own place.

     44.     Because her parents did not have resources to support her, Jane Doe One searched

for a job in Kiev to support herself and pay for her schooling.

     45.     In August 2003, Jane Doe One responded to an employment ad for a waitress

position.  But, during Jane Doe One's initial interview with Veniamin Gonikman regarding the

waitress position, he told her that there were no more waitress positions available.  He persuaded

her to become a stripper at his night club instead.  Gonikman told her that if she became a

Americas 90418210

stripper she would make $50 a night instead of $5 a night working as a waitress.  Jane Doe One was desperate to obtain a job and reluctantly agreed.

46.   Several months later, knowing that Jane Doe One was not comfortable with her new job as a stripper, Gonikman promised her a job as a waitress at a restaurant in the United States through a student exchange program.

47.   Gonikman, and the other Beauty Search Partners, who Jane Doe One had met at the club, told her she would make a lot of money as a waitress on a student visa, and then could return to the Ukraine within 4 months.

48.   Around this time, Jane Doe One was introduced to Sands during Sands' trip to the Ukraine to visit a club named "Vegas," one of Gonikman's strip clubs in Kiev, Ukraine.  Jane Doe One was told by the Beauty Search Partners that Sands was a friend of theirs but was not told the nature of his business.

49.   Directed by the Beauty Search Partners, Jane Doe One applied for a visa using documents she received from Gonikman and one of his business partners.

50.   Jane Doe One obtained a four-month J-1 student visa to work as a waitress in Virginia.  Gonikman and the Beauty Search Partners arranged and paid for both the visa and the airplane ticket to the United States.  Jane Doe One was given $400 in cash and was told that when she landed in the United States, transportation would be arranged to take her to Virginia Beach and the restaurant where she would be working.

51.   Jane Doe One flew to Washington D.C. on May 26, 2004 with the belief that she was participating in a student exchange program and that she would be working as a waitress in Virginia.

Americas 90418210

IV.   Jane Doe Two

52.   Gonikman and Maksimenko also recruited and enticed Jane Doe Two to travel to the United States through manipulation and coercion.

53.   Maksimenko manipulated and influenced Jane Doe Two by dating her in the Ukraine, thereby gaining her trust.   Jane Doe Two eventually came to trust and listen to Maksimenko.

54.   Maksimenko and Gonikman told Jane Doe Two that she could have a good life in the United States and earn more money than she could in the Ukraine.

55.   Like Jane Doe One, Jane Doe Two also met Sands in the Ukraine at Gonikman's club.  Sands was also introduced to her as a "friend" of the Beauty Search Partners.

56.   Initially, the Beauty Search Partners told Jane Doe Two that they would obtain immigration documents for her travel to the United States through a student exchange program.

57.   After she had agreed to participate in the student exchange program, Jane Doe Two learned that her visa would actually be obtained through a fraudulent marriage.

58.   The Beauty Search Partners arranged Jane Doe Two's fraudulent marriage.  Once the visa was obtained, Gonikman arranged for Jane Doe Two to fly to the United States.  She was given $300 for expenses for her trip to the United States, which Aronov took back from her as soon as she arrived in the United States.

V.   Involuntary Servitude, Forced Labor and Forced Sexual Services in the United States

59.   Jane Doe One arrived in the United States on or about May 26, 2004.  Jane Doe Two arrived on or about September 10, 2004.

60.   When Jane Doe One arrived in Washington, D.C., Aronov met her at the airport and told her that there was a change of plans and she would be going to Michigan.  Aronov put

15

her on a bus to Detroit.  Jane Doe One felt that she had no choice but to comply with his demands.

61.    Jane Doe Two was met at the New York airport by Aronov who flew with her to Detroit.

62.    Once in Detroit, the Beauty Search Partners brought Jane Doe One to a hotel, where they confiscated all of her identification documents, including her passport, birth certificate and visa.  They told her that she owed them approximately $30,000 for her visa and travel expenses to the United States.  The Beauty Search Partners told Jane Doe One that to repay the money she owed them, she would be stripping and performing lap dances at a club (Cheetah's On The Strip), and all the money she made would have to be turned over to the Beauty Search Partners until the debt was repaid.

63.    The Beauty Search Defendants put Jane Doe One in an apartment with another woman from the Ukraine where she was kept as a virtual prisoner for the next eight and a half months.

64.    Similarly, the Beauty Search Partners brought Jane Doe Two to a hotel, and confiscated all of her identification documents, including her passport, birth certificate and visa. She was told that she owed the Beauty Search Partners approximately $30,000 for her visa and travel expenses.  She was told that, to pay the money back, she would have to turn over, to the Beauty Search Partners, all the money she earned stripping and giving lap dances at Cheetah's On The Strip.

65.    Like Jane Doe One, Jane Doe Two was also kept in captivity in an apartment in the suburbs with another young Ukrainian woman.

16

66.     Jane Doe One and Two were terrified and wanted to escape, but they did not know where to go or whom they could trust.  They had no identification documents or money and did not speak English well enough to communicate with anyone.

67.     Without identification documents, money or the ability to communicate in English, Jane Doe One and Two were at the mercy of the Beauty Search Partners.

68.     Maksimenko and Aronov took Jane Doe One and Two to Cheetah's On The Strip, a strip club on 8 Mile Road, where they were met by Sands.[4]  Sands, purporting to act as their agent, helped arrange for Jane Doe One and Two to work at Cheetah's On The Strip.  After Sands introduced Jane Doe One and Two to the management of Cheetah's On The Strip and showed them the dressing room and dancing stages, Plaintiffs were forced to begin working at the club that same night.

69.     The women were forced to strip and provide lap dances at Cheetah's On The Strip for 12 hours a day, six days a week, for more than 72 hours a week, month after month.  The women could not refuse to work as strippers at Cheetah's On The Strip or they would be beaten.

70.     Each day before noon, Maksimenko and Aronov would pick up Jane Doe One and Jane Doe Two and the other women at the apartment building where they were being held captive and would drop them off at Cheetah's On The Strip.  The women were forced to strip and provide lap dances at the club every hour that the club was open (2 P.M. to 2 A.M.), six days a week.

71.     After every shift they were forced to work, the women would be picked up by one or more of the Beauty Search Partners between 2:00 A.M. and 4:00 A.M.  The men would force

---

[4] Sands Dep. at 64:11-65:2.

Americas 90418210

them into a car and would refuse to start the engine until the women turned over all the money they had earned that night.

72.     Jane Doe One and Two were not allowed to keep any of the money they earned for themselves.

73.     Jane Doe One and Two and the other women continued this same routine day after day and night after night for months.

74.     To maintain leverage over the women, Aronov and Maksimenko, as instructed by Gonikman, isolated the women, kept the women's passports and identification documents and used threats of imprisonment as well as mental, physical and sexual abuse.

75.     In addition to forced labor and services at the club, the Beauty Search Partners demanded and forcefully took sexual services from the women outside the club at the apartment building where they held the women captive.

VI.     Isolation in the United States

76.     To maintain leverage and increase Jane Doe One and Two's vulnerability and dependency on the Beauty Search Partners, the men kept Jane Doe One and Two isolated.  As a result, the women were essentially prisoners of the Beauty Search Partners.

77.     Jane Doe One and Two spoke little English and had no friends or family in the United States.  The Beauty Search Partners confiscated the women's identification and immigration documents, including their passports, birth certificates and visas.

78.     Both women were kept in an apartment building located in the suburbs. They had no means of transportation, including no access to public transportation.  There was no telephone in their apartments and they were not permitted to have private conversations on telephones or cellphones.  On the rare occasion when the women were allowed (or forced) to make phone calls,

18

these calls were made from Maksimenko and Aronov's phones.  One or more of the Beauty

Search Partners always listened in on these calls.

79.     Occasionally the women were forced to call their family members and tell them

they were doing well.  Maksimenko and Aronov monitored these calls.

80.     Maksimenko and Aronov had keys to both Jane Doe One and Two's apartments.

They would enter whenever they wanted, including when the women were sleeping or

showering.  They would also enter the apartments when the women were not there to conduct

searches to ensure that the women were not hiding any money.

81.     Jane Doe One and Two were never allowed to leave the apartment building by

themselves.  Maksimenko and Aronov would pick them up for work each day at around noon.

When their shift ended – anywhere between 2 A.M and 4 A.M. – Maksimenko and Aronov

dropped the women off at their apartments.

82.     Jane Doe One and Two were not allowed to communicate freely with customers

at Cheetah's on the Strip.  If a bouncer at Cheetah's On The Strip noticed Jane Doe One or Two

talking "too much" to a particular customer, the bouncer would inform one of the Beauty Search

Partners who would then threaten the women.

VII.    Methods of Control, Force, Intimidation and Coercion

a.      **Threats and Abuse**

83.     The Beauty Search Partners used calculated methods of intimidation that they

referred to as "the System" to subdue and scare Jane Doe One and Two.  Aronov and

Maksimenko would beat the women, intimidate them with handguns and baseball bats, and

threaten to handcuff them if they did not do what they were told.  If Jane Doe One and Two did

19

not earn enough money, if they did not turn over all their earnings, even if they were seen talking too much to any particular customer, they were subject to "the System".

84.     On information and belief two of the Beauty Search Partners boasted to the owner of Cheetah's On The Strip: "We taught them well. We smacked 'em around and everything.... You gonna see them right now.... So quiet.  So respectful.  No problems."

85.     Jane Doe One was repeatedly threatened and mentally and physically abused.

86.     In or about August 2004, Jane Doe One was taken to the basement of Maksimenko's house and, for no other reason than to intimidate her, Aronov and Maksimenko boasted about previous occasions when they had handcuffed a woman and left her in the basement.

87.     Maksimenko and Aronov again threatened and intimidated Jane Doe One in or about August 2004, by forcing her to watch while they hit and threatened her roommate with a handgun, claiming she "stole" from them by failing to turn over all of her earnings.

88.     In or about August 2004, while sitting in a car, Maksimenko brandished a handgun at Jane Doe One after telling her she had not been earning enough money as a stripper at the club.

89.     In or about the Fall of 2004, Maksimenko and Aronov beat both Jane Doe One and her roommate and then isolated them in the basement.

90.     The Beauty Search Defendants similarly intimidated and mentally abused Jane Doe Two.

91.     The Beauty Search Partners intimidated and mentally abused Jane Doe Two by threatening her and forcing her to be witness to the physical abuse and suffering of Jane Doe One and other women.  Jane Doe Two never said anything about the conditions she and the other

20

women were forced to endure because she knew that if she did, there would be trouble.  She knew this because of what she saw Maksimenko and Aronov do to the other women.

92.    The Beauty Search Partners, themselves and by and through their agents, also threatened Jane Doe One and Two's family members in the Ukraine.

93.    When Defendant Maksimenko was arrested in February 2005 for the conduct alleged herein, Defendant Gonikman called Jane Doe One's mother in the Ukraine and threatened her.  He told her that he would "make blood run."

### b.    Sexual Assault and Rape

94.    Defendants also used sexual abuse as a means to control and intimidate Jane Doe One and Jane Doe Two.

95.    Maksimenko and Aronov treated the women as their property.  Maksimenko told Jane Doe One repeatedly: "You are our property.  You will do what you are told as long as we want" and "you will never go home again."

96.    Maksimenko and Aronov required the women to provide them with money and sexual intercourse on demand.

97.    Approximately three weeks after Jane Doe One arrived in Detroit, Defendant Maksimenko raped her.  Jane Doe One tried to resist him and fight back but he overpowered her and forced himself on her.

98.    After he raped her the first time, Maksimenko came to the apartment once a week and forced Jane Doe One to have sex with him unless she could prove she was menstruating. She was beaten and threatened if she did not do what she was told.  When Jane Doe One would say no, Maksimenko would tell her to "stop being a little girl" and that it was "best" for her.

21

99.     Maksimenko was very rough during these sexual encounters, he would strangle Jane Doe One and forcefully slap and bite her, often leaving Jane Doe One with bruises and bite marks.

100.     Jane Doe One, isolated, intimidated, physically, sexually and mentally abused and fearing retribution, was too scared to try to escape or tell anyone about the rapes.

101.     Jane Doe Two was also forced to have sex with Maksimenko.  Because the Defendants held her as a virtual prisoner, Jane Doe Two felt helpless.  She believed that there was no way to stop Maksimenko's brutal sexual attacks.

VIII.    Jane Doe One's Escape and the Rescue of Jane Doe Two

102.     Jane Doe One was ordered to keep track of her earnings in a journal ("the ledger") until the she had earned the $30,000 she was told she owed the Beauty Search Partners.  Jane Doe One hoped she would be allowed to leave once she paid back the alleged debt.

103.     However, once she earned the $30,000, Jane Doe One was informed that she was not allowed to leave.  Instead, the Beauty Search Defendants ordered her to burn the ledger.  It was at this point that Jane Doe One realized that the Beauty Search Partners did not intend to allow her to return home.

104.     As Jane Doe One became more and more desperate to leave, Maksimenko told her repeatedly she could not leave.  He threatened her, telling her that she had to do what he told her to do as long as he wanted her to do it.  He told her repeatedly, "You are our property" and that she should "forget about going home.  You will never go home again."

105.     Isolated and abused, Jane Doe One and Two felt helpless.

106.     Jane Doe One attempted to commit suicide multiple times.

22

107.     Out of desperation, Jane Doe One and one of the other Ukrainian women also held prisoner by the Beauty Search Partners decided that they had to try to escape.  The women had no money of their own because they were forced to turn over all of their earnings from the strip club to the Beauty Search Partners.  However, sometimes when Maksimenko and Aronov went on convenience store runs, they would send Jane Doe One or one of the other women into the store to make the purchase.  Once they decided to escape, Jane Doe One and her roommate began hiding, in candy boxes, some of the change they received on these convenience store runs.  Because Aronov and Maksimenko had keys to and routinely searched their rooms, the women buried the candy boxes in a hole beside a tree outside the apartment building.

108.     Eventually, Jane Doe One became friendly with one of her customers at Cheetah's On The Strip.  The customer seemed sincerely concerned about her, and thus Jane Doe One decided to risk confiding in him.  She had to be careful because the Beauty Search Partners did not allow her to freely talk to customers, and she knew that the bouncers at Cheetah's On The Strip would tell the Beauty Search Partners if they saw her talking to anyone for any length of time.

109.     The man, hearing of the mental, physical and sexual abuse and of Jane Doe One's desperate situation, wanted to help Jane Doe One escape.  He offered to take her to the F.B.I. for protection.

110.     Jane Doe One was initially not even able to tell the customer where she lived as she did not know her address.  She eventually managed to look at a neighbor's unopened mail to learn the address.

111.     On February 14, 2005, Jane Doe One, using window shades, signaled to the customer that she and her roommate were alone.  The customer drove a car by Jane Doe One's

23

apartment and Jane Doe One and her roommate made a run for the car, carrying a few of their

belongings in garbage bags so that Maksimenko and Aronov would think they were taking out

the trash and not become suspicious.  The man drove Jane Doe One to Immigration and Customs

Enforcement where she reported the enslavement and abuse to immigration officials.

112.    Two days later an F.B.I. swat team raided the apartment where Jane Doe Two and

other women were being held.  Jane Doe Two and the other women were rescued.  Maksimenko

and Aronov were arrested.

113.    Jane Doe One and Two suffered and continue to suffer serious and long term

damage from the actions of the Defendants.

IX.    Beauty Search Partners' Financial Gain

114.    Jane Doe One turned over approximately $500–$700 in cash to Maksimenko and

Aronov every night.  She did this every night she was forced to strip and provide lap dances at

Cheetah's On The Strip – 6 days a week every week for the entire time she was held captive,

which was nearly nine months.

115.    Jane Doe One was forced to keep a ledger of her earnings until she paid off her

$30,000 "debt" to the Beauty Search Partners.  When she had earned $30,000, Aronov and

Maksimenko destroyed the ledger.  Even after she had earned and turned over $30,000 to pay her

"debt" to the Beauty Search Partners, Jane Doe One was forced to continue to strip and provide

lap dances at Cheetah's On The Strip.  In total, Jane Doe One was forced to strip and provide lap

dances at Cheetah's On The Strip for nearly nine months before she was rescued.  She earned

approximately $3,000–$4,000 each week.

116.    Jane Doe Two turned over approximately $400–$500 in cash to Maksimenko and

Aronov every night.  She did this every night she was forced to strip and provide lap dances at

Americas 90418210

Cheetah's On The Strip – 6 days a week every week for the entire time she was held captive, which was 6 months.

117.   Jane Doe Two also was forced to keep a ledger of her earnings until she paid off her $30,000 "debt" to the Beauty Search Partners.  When she had earned $30,000, Aronov and Maksimenko destroyed the ledger.  Even after she had earned and turned over $30,000 to pay her "debt" to the Beauty Search Partners, Jane Doe Two was forced to continue to strip and provide lap dances at Cheetah's On The Strip.  In total, Jane Doe Two was forced to strip and provide lap dances at Cheetah's On The Strip for approximately 6 months before she was rescued.  She earned approximately $10,000 each month.

118.   On information and belief, the Beauty Search Partners split the money they took from Jane Doe One and Two by thirds.  On information and belief, Aronov and Maksimenko also sent money they confiscated from Jane Doe One and Two to Gonikman in the Ukraine.

X.   Defendant BFC's Involvement

119.   Defendant BFC, through its management and personnel, knew and/or were reckless in not knowing of the Beauty Search Partners' scheme and substantially assisted in the object of the scheme, i.e. the forced labor and forced sexual services of Jane Doe One and Two, by providing the Beauty Search Partners with access to the club and all its customers and the resulting financial benefit to both the Beauty Search Partners and BFC.

120.   At all relevant times, BFC maintained full authority and control over the day to day operations of the club, which included the oversight, management and payment of the dancers who performed for BFC's customers.

121.   Defendant BFC, through its management and personnel, knew and/or were reckless in not knowing that Jane Doe One and Two were not being paid for their services and

25

that they were being forced and coerced, by the Beauty Search Partners, to perform as strippers against their will, every hour that the club was open (from 2 P.M. to 2 A.M.), six days a week, month after month.  BFC also knew that Plaintiffs worked significantly longer hours than most of the other dancers BFC employed.

122.   For example, all dancers working at Cheetah's On The Strip were required to pay a "house fee."  Each night, the bouncers employed by BFC would count each dancer's money to ensure that the dancers were paying the appropriate "house fee."  For nearly nine months, Jane Doe One was forced to strip and provide lap dances to BFC's customers and was never charged a house fee by BFC.  Similarly, for nearly six months, Jane Doe Two was forced to strip and provide lap dances to BFC's customers and was never charged a house fee by BFC.  Moreover, although they did so for all the other dancers at the club, BFC bouncers never counted the money that Jane Doe One and Two earned each night.

123.   On at least one occasion, Jane Doe One observed Maksimenko give money to one of the owners of Cheetah's On The Strip.

124.   Defendant BFC, through its management and personnel, knew and/or were reckless in not knowing that the Beauty Search Partners were confiscating Jane Doe One and Two's earnings and knowingly and/or recklessly permitted this to occur on the premises of the club then known as Cheetah's On The Strip.

125.   Defendant BFC knew, and its management and personnel took actions to ensure, that Jane Doe One and Two were not allowed to leave the club unless one of the Beauty Search Partners picked them up.

126.   Defendant BFC, through its management and personnel, knew and/or were reckless in not knowing that the Beauty Search Partners were using force, intimidation and

26

coercion to control and exploit Jane Doe One and Two.  On information and belief, two of the Beauty Search Partners boasted to the owner of Cheetah's On The Strip: "We taught them well. We smacked 'em around and everything…. You gonna see them right now…. So quiet.  So respectful.  No problems."

127.    For its part, Defendant BFC, through its management and personnel, communicated routinely with the Beauty Search Partners and notified them when Jane Doe One and Two had not met the Beauty Search Partners' financial expectations or were conversing too often with the same clients.

128.    Yet another example of BFC's knowledge of the scheme (or its recklessness in not knowing) is BFC's actions, through its employees, when authorities would come to the club for routine inspections.  For the first one to two months after she was forced to begin stripping at the club, Jane Doe One and another woman held captive by the Beauty Search Partners did not have the mandatory dancing licenses to legally dance at the club.  As such, during this time, when authorities came to perform inspections of the club, club employees hid Jane Doe One and the other woman in the club basement.

129.    Defendant BFC benefitted financially and/or received value from participating in the Beauty Search Partners' exploitation of Jane Doe One and Two.

130.    The foregoing allegations contained in ¶¶ 118-128 demonstrate that BFC knew or was reckless in not knowing of and substantially aided and abetted the Beauty Search Partners' scheme to exploit Jane Doe One and Two and force them to engage in commercial sex acts and forced labor through means of force, fraud and coercion.

XI.    The Beauty Search Partners' Arrest and Conviction

131.    Maksimenko and Aronov were arrested in February 2005.

27

132.    Gonikman became a fugitive and eventually was apprehended in the Ukraine in January 2011 and deported to the United States to face criminal proceedings in the Eastern District of Michigan.

133.    In 2012, Gonikman pled guilty in the district court for the Eastern District of Michigan to money laundering conspiracy under 18 U.S.C. § 1956(h).  Gonikman was sentenced to 36 months in prison and 36 months under probation (Case No. CR-05-80187-VAR-LJM).

134.    Likewise, Maksimenko pled guilty in the district court for the Eastern District of Michigan to forced labor conspiracy under 18 U.S.C. § 241, alien smuggling conspiracy under 8 U.S.C. § 1324(a)(1) and money laundering conspiracy under 18 U.S.C. § 1956(h).  Maksimenko was sentenced to fourteen years in prison (Case No. CR-05-80187-VAR-LJM).

135.    Aronov also pled guilty in the district court for the Eastern District of Michigan to forced labor conspiracy under 18 U.S.C. § 241, alien smuggling conspiracy under 8 U.S.C. § 1324(a)(1) and money laundering conspiracy under 18 U.S.C. § 1956(h).  Aronov was sentenced to seven and a half years in prison (Case No. CR-05-80187-VAR-LJM).

## FIRST CAUSE OF ACTION

### Forced Labor Against All Defendants
### (18 U.S.C. §§ 1589, 1595(a))

136.    Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

137.    Plaintiffs are authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

138.    Defendants Gonikman, Maksimenko, and BFC, through its management and personnel, knowingly provided and/or obtained the labor and services of Plaintiffs by threats of serious harm to, or physical restraint against Plaintiffs or other persons.

28

139.     Defendants Gonikman, Maksimenko, Sands, Rose Talent and BFC, through its management and personnel, knowingly provided and/or obtained Plaintiffs' labor and services by means of a scheme, plan, or pattern intended to cause Plaintiffs to believe that if they did not perform such labor or services, Plaintiffs would suffer serious harm or physical restraint.

140.     Defendants Gonikman, Maksimenko, together with Aronov, used threats of serious harm to Jane Doe One and Two, physical restraint of Jane Doe One and Two and a scheme or pattern of threats and abuse, i.e. "the System," to cause Jane Doe One and Two to believe that if they failed to obey Defendants' orders, including the mandate to strip at Cheetah's On The Strip 12 hours a day, six days a week, for 72 or more hours per week, month after month, and turn over all their earnings, Jane Doe One and Two and/or their family members would suffer serious harm.

141.     Defendant Sands, Rose Talent and BFC knew or was reckless in not knowing that Defendants Gonikman, Maksimenko and Aronov were using threats of serious harm and physical restraint against Plaintiffs to cause Plaintiffs to provide labor and services at Cheetah's On The Strip.  Defendant BFC, through its management and personnel, also engaged in the physical restraint of Plaintiffs when BFC bouncers refused to permit Plaintiffs to leave the club unless they were accompanied by one or more of the Beauty Search Partners.

142.     Defendant Sands, Rose Talent and BFC, through its management and personnel, benefitted financially or received something of value from the forced labor and services provided by Plaintiffs to BFC's customers at Cheetah's On The Strip.

143.     In addition to forced labor in the club, Defendants Gonikman, Maksimenko and Aronov forced Plaintiffs to provide sexual services outside the club on Defendants' demand.

Defendants used threats of serious harm and physical restraint to obtain these sexual services from Plaintiffs.

144.    Plaintiffs suffered injuries and damages as a result of Defendants' actions.

145.    Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

## SECOND CAUSE OF ACTION

### Sex Trafficking By Force, Fraud or Coercion Against All Defendants
### (18 U.S.C. §§ 1591, 1595(a))

146.    Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

147.    Plaintiffs are authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

148.    Defendants Gonikman, Maksimenko, Sands and Rose Talent recruited, enticed, harbored, transported, provided and/or obtained Plaintiffs, knowing that means of force, fraud, coercion, and the combination of such means would be used to force Plaintiffs to engage in the commercial sex acts of stripping and providing lap dances in violation of 18 U.S.C. § 1591(a)(1).

149.    Defendants Gonikman, Maksimenko, together with Aronov, used threats of serious harm to Jane Doe One and Two, physical restraint of Jane Doe One and Two and a scheme or pattern of threats and abuse, i.e. "the System," to cause Jane Doe One and Two to believe that if they failed to obey Defendants' orders, including the mandate to strip at Cheetah's On The Strip 12 hours a day, six days a week, for 72 or more hours per week, month after month, and turn over all their earnings, Jane Doe One and Two and/or their family members would suffer serious harm.

30

150.     Defendants Gonikman and Maksimenko benefitted financially from the sex trafficking of Plaintiffs.  On information and belief, Defendants made more than $100,000 from the sex trafficking of Plaintiffs.

151.     Defendants Sands, Rose Talent and BFC, through their management and personnel, obtained Plaintiffs and Plaintiffs' services knowing that means of force, threats of force, fraud, coercion, and the combination of such means would be used to cause Plaintiffs to engage in commercial sex acts in violation of 18 U.S.C. § 1591(a)(1).

152.     Defendants Sands, Rose Talent and BFC, through their management and personnel, benefitted financially from the sex trafficking of Plaintiffs where Plaintiffs were forced to strip and provide lap dances to BFC's customers at Cheetah's On The Strip.

153.     Plaintiffs suffered injuries and damages as a result of Defendants' actions.

154.     Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

## THIRD CAUSE OF ACTION

**Trafficking with respect to Peonage, Slavery, Involuntary Servitude or Forced Labor Against Defendants Gonikman and Maksimenko
(18 U.S.C. §§ 1590, 1595(a))**

155.     Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

156.     Plaintiffs are authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

157.     Defendants Gonikman and Maksimenko knowingly and willfully held Plaintiffs in involuntary servitude and forced labor, mentally, physically and sexually abusing them and

31

forcing them to work 12 hours a day, six days a week, for 72 or more hours per week, month after month. Defendants Gonikman and Maksimenko confiscated all of Plaintiffs' earnings.

158. Defendants Gonikman and Maksimenko compelled Plaintiffs to work against their will as strippers and to provide sexual services for the benefit of Defendants Gonikman and Maksimenko, by the use of force, the threat of force, or the threat of legal coercion.

159. The forced sexual services that Plaintiffs were compelled to provide include both stripping, lap dances and the sexual brutality inflicted upon Plaintiffs by Aronov and Maksimenko.

160. Defendants Gonikman and Maksimenko exploited the Plaintiffs' vulnerability and directed, assisted, conspired, and acted in concert with each other to create and perpetuate a system of involuntary servitude and forced labor prohibited by 18 U.S.C. § 1590.

161. Plaintiffs suffered injuries and damages as a result of Defendants' actions.

162. Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

## FOURTH CAUSE OF ACTION

**Aiding and Abetting Violations of Forced Labor Against Defendants Sands, Rose Talent and BFC Management**

163. Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

164. The Beauty Search Partners obtained and/or provided the labor and services of Plaintiffs by threats of serious harm to, or physical restraint against Plaintiffs or other persons in violation of 18 U.S.C. § 1589.

165. Defendants Sands and Rose Talent, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners' forced labor activities by,

Americas 90418210

among other things, (a) lending an air of legitimacy to the Beauty Search Partners' scheme by giving an "American face" to the promises of legitimate employment in the United States, (b) acting as Plaintiffs agent and placing Plaintiffs as strippers at Cheetah's On The Strip, and (c) obtaining dancing licenses for the women the Beauty Search Partners trafficked and forced to strip in the Detroit area, including Plaintiffs.

166.    Defendant BFC, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners' forced labor activities by, among other things, (a) providing the Beauty Search Partners with access to the club and all of BFC's customers, knowing or being reckless in not knowing that Plaintiffs were being forced to strip and provide lap dances against their will and for no compensation; (b) acting as virtual "spies" for the Beauty Search Partners while Plaintiffs were at the club and reporting on Plaintiffs' conduct and financial progress to the Beauty Search Partners; (c) not permitting Plaintiffs to leave the club unless they were accompanied by one or more of the Beauty Search Partners; and (d) hiding the women during license checks or visits by regulatory officials in order to conceal that undocumented women worked in the club against their will.

167.    Defendants Sands, Rose Talent and BFC were aware of its role in the Beauty Search Partners' forced labor of Plaintiffs when Sands, Rose Talent and BFC provided substantial assistance to the Beauty Search Partners in furtherance of the Beauty Search Partners' forced labor of Plaintiffs.

168.    Plaintiffs suffered injuries and damages as a result of Defendants' actions.

169.    Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Violations of Sex Trafficking by Force, Fraud or Coercion Against Defendants Sands, Rose Talent and BFC Management

170.    Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

171.    Defendants Gonikman and Maksimenko, together with Aronov, engaged in sex trafficking by recruiting, enticing, harboring transporting, and providing Plaintiffs, knowing that means of force, fraud, coercion, and the combination of such means would be used to cause Plaintiffs to engage in commercial sex acts in violation of 18 U.S.C. § 1591.

172.    Defendants Sands and Rose Talent, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners' forced labor activities by, among other things, (a) lending an air of legitimacy to the Beauty Search Partners' scheme by giving an "American face" to the promises of legitimate employment in the United States, (b) acting as Plaintiffs agent and placing Plaintiffs as strippers at Cheetah's On The Strip, and (c) obtaining dancing licenses for the women the Beauty Search Partners trafficked and forced to strip in the Detroit area, including Plaintiffs.

173.    Defendant BFC, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners' sex trafficking activities as described in the First Cause of Action by, among other things, (a) providing them with access to the club and all of BFC's customers, knowing or being reckless in not knowing that Plaintiffs were being forced to strip and provide lap dances against their will and for no compensation; (b) acting as virtual "spies" for Beauty Search Partners while Plaintiffs were at the club and reporting on Plaintiffs' conduct and financial progress to the Beauty Search Partners; (c) not charging Plaintiffs the mandatory "house fee" that BFC charged all of its other dancers; and (d) hiding the women

34

during license checks or visits by regulatory officials in order to conceal that undocumented women worked in the club against their will.

174. Defendants Sands, Rose Talent and BFC were aware of their role in the Beauty Search Partners' illegal sex trafficking scheme when it provided substantial assistance in the scheme to the Beauty Search Partners.

175. Defendants Sands, Rose Talent and BFC benefitted financially from their substantial assistance to the Beauty Search Partners in their sex trafficking activities.

176. Plaintiffs suffered injuries and damages as a result of Defendants' actions.

177. Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

## SIXTH CAUSE OF ACTION

**Aiding and Abetting Violations of Trafficking with respect to Peonage, Slavery, Involuntary Servitude or Forced Labor Against Defendants Sands, Rose Talent and BFC Management**

178. Plaintiffs re-allege paragraphs 1 – 135 above as though fully set forth herein.

179. Defendants, the Beauty Search Partners, knowingly recruited, harbored, transported and provided Plaintiffs for labor or services in violation of 18 U.S.C. § 1590.

180. Defendants Sands and Rose Talent, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners' forced labor activities by, among other things, (a) lending an air of legitimacy to the Beauty Search Partners' scheme by giving an "American face" to the promises of legitimate employment in the United States, (b) acting as Plaintiffs agent and placing Plaintiffs as strippers at Cheetah's On The Strip, and (c)

35

obtaining dancing licenses for the women the Beauty Search Partners trafficked and forced to strip in the Detroit area, including Plaintiffs.

181.    Defendant BFC, through its management and personnel, knowingly and substantially assisted the Beauty Search Partners trafficking of Plaintiffs into involuntary servitude and forced labor as described in the Third Cause of Action by, among other things, (a) providing the Beauty Search Partners with access to the club and all of BFC's customers, knowing or being reckless in not knowing that Plaintiffs were being forced to strip and provide lap dances against their will and for no compensation; (b) acting as virtual "spies" for the Beauty Search Partners while Plaintiffs were at the club and reporting on Plaintiffs' conduct and financial progress to the Beauty Search Partners; (c) not permitting Plaintiffs to leave the club unless they were accompanied by one or more of the Beauty Search Partners; and (d) hiding the women during license checks or visits by regulatory officials in order to conceal that undocumented women worked in the club against their will.

182.    Defendants Sands, Rose Talent and BFC were aware of their role in the Beauty Search Partners' trafficking, recruitment and providing of Plaintiffs for involuntary servitude and forced labor at BFC's club, Cheetah's On The Strip, when BFC provided substantial assistance to the Beauty Search Partners in furtherance of this illegal activity.

183.    Sands, Rose Talent and BFC acted with the intent to facilitate the Beauty Search Partners' trafficking, recruitment and providing of Plaintiffs for involuntary servitude and forced labor.

184.    Plaintiffs suffered injuries and damages as a result of Defendants' actions.

185.    Plaintiffs are entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, reasonable attorneys' fees, and costs for the wrongful conduct of Defendants.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court will:

a.    Enter judgment against Defendants in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.    Award Plaintiffs punitive damages in an amount to be determined by the jury;

c.    Award Plaintiffs their actual expenses of litigation, including attorneys' fees; and

d.    Award Plaintiffs such other and further relief as the Court deems necessary and proper.

Respectfully submitted, this __ day of _____, 2015.

WHITE & CASE LLP

By:    _____
        Gregory Little (*pro hac vice*)
        Danielle Audette (*pro hac vice*)
        1155 Avenue of the Americas
        New York, New York 10036
        Telephone:  (212) 819-8200
        glittle@whitecase.com
        daudette@whitecase.com

        *Attorneys for Plaintiffs Jane Doe One and Jane Doe Two*

37
